UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN BOADEN, et al., | No. 18 CV 3314 |
| Plaintiffs, | No. 20 CV 5127 |
| | No. 21 CV 2349 |
| v. | No. 21 CV 4010 |
| | No. 23 CV 1477 |
| CONTINENTAL CASUALTY COMPANY, | |
| Defendants. | Judge Georgia N. Alexakis |

**MEMORANDUM OPINION AND ORDER**

John Boaden and the other named plaintiffs in five related cases (collectively, "plaintiffs") purchased long-term care insurance from Continental Casualty Company ("Continental") through their employers.[1] After Continental began raising rates on a state-by-state basis, plaintiffs sued, seeking to represent various classes of policy holders who were affected by the rate changes, under the theory that the state-by-state rate change violated a promise by Continental to only raise rates uniformly for the entire "premium class," which plaintiffs assert means all policyholders nationwide. Plaintiffs now move for class certification. [132], [163].[2] Two additional motions have also been filed: Continental moves to exclude the testimony of Roger Loomis, an expert for plaintiffs, [156], [161], and the American Council of Life

---

[1] The five related cases are: *Gunn, et al. v. Continental Casualty Company*, No. 18 CV 3314 (N.D. Ill.); *Sieving, et al. v. Continental Casualty Company*, No. 20 CV 5127 (N.D. Ill.); *Brown, et al. et v. Continental Casualty Company*, No. 21 CV 2349 (N.D. Ill.); *Cheslow, et al. et v. Continental Casualty Company*, No. 21 CV 4010 (N.D. Ill.), and *Boaden, et al. et v. Continental Casualty Company*, No. 23 CV 1477 (N.D. Ill.).

[2] Docket citations are to *Boaden*, No. 23 CV 1477, unless otherwise noted.

Insurers and the American Property Casualty Insurance Association move for leave to file an amicus brief, [169].

For the following reasons, the Court denies all motions.

## I.  Background

The parties agree on the basic history of the case. Continental provides long-term care insurance policies to cover expenses like assisted living, adult daycare centers, or skilled nursing facilities. [88] ¶ 61. Continental issued these policies nationwide. *Id.* ¶ 242. Long-term care coverage policies can last for decades; for example, plaintiff Boaden purchased a certificate of coverage in 1994 and has paid premiums to Continental since that date, *id.* ¶ 117, and plaintiffs James Carlson and William Costello originally purchased coverage in 1989 and also have maintained coverage since then, *id.* ¶ 118.

The Continental policies at issue all contain the following language: "We cannot change the Insured's premiums because of age or health. We can, however, change the Insured's premiums based on his or her premium class, but only if We change the premiums for all other Insureds in the same premium class." [132-4] at 50; *see also* [88] ¶¶ 323–24.[3] The parties agree that the term "premium class" is not defined in the policies. [163] at 7; [160] at 1.

In 2015, Continental began raising premium rates on the plaintiffs' long-term care policies. [88] ¶¶ 16–17. Rate increases must be approved by state insurance regulators, and Continental sought increased rates unevenly on a state-by-state

[3] The Court uses the blue CM/ECF pagination for this exhibit.

basis. *Id.* For example, Continental sought to increase rates by 15% in Maryland but 95.5% in Illinois. *Id.* ¶ 283. The subsequent variations in rate increases were significant: some states saw rates more than double, while others saw no increases at all. *Id.* ¶¶ 284–85. According to plaintiffs, in addition to raising premium costs, these rate increases were intended to and resulted in Continental customers reducing or dropping their coverage, long after they had begun paying their premiums. [163] at 11. Plaintiffs describe this consequence as a "shock lapse" that Continental specifically intended. *Id.*

As a result of these rate increases, plaintiffs filed five putative class actions against Continental. *See supra* note 1. These cases, now consolidated, share a core theory: that the undefined term "premium class" in the insurance agreements refers to a nation-wide class of insured that "does not contemplate state-to-state variations in premium increases," [163] at 7, and that by pursuing such uneven increases Continental has engaged in breach of contract and fraudulent concealment, [87] at 78–80. Plaintiffs seek certification of the following classes under Federal Rule of Civil Procedure 23:

> Declaratory and Injunctive Relief Class: All persons insured under a Continental Casualty Company GLTC2 group long-term care insurance policy that was in force at the time CNA issued its first rate-increase notification letter covering that group policy.
>
> Damages Class: All persons insured under a Continental Casualty Company GLTC2 group long-term care insurance policy that were subjected to a rate increase.
>
> Reinstatement Class: All individuals who are or were insured under a Continental Casualty Company GLTC2 group long-term care insurance policy who have surrendered, reduced and/or dropped benefits and/or

coverage at any point after CNA issued the initial rate-increase notification letter covering that group policy.

[163] at 16. And "in the event Court declines to certify a product-wide fraud class," plaintiffs seek to certify six, state-specific "Fraudulent Concealment Subclasses within the damages class, consisting of class members who at the time their certificates were issued resided in the states of Illinois, California, Florida, Connecticut, Washington, and Arizona." *Id.*

## II. Analysis

Plaintiffs "bear[] the burden of demonstrating that certification is proper by a preponderance of the evidence." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). In determining whether they have met this burden, the Court only evaluates evidence to decide whether certification is proper. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Class-certification proceedings are not a "dress rehearsal for the trial on the merits." *Id.*

Under Rule 23(a) of the Federal Rules of Civil Procedure, plaintiffs must satisfy the following prerequisites for bringing a class action in federal court: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a). The Seventh Circuit also has "long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Plaintiffs who establish all of those elements must then show they qualify for a particular type of class action under Rule 23(b).

4

### A.     Rule 23(a)

Continental concedes that plaintiffs satisfy the numerosity requirement, [160] at 28 and does not dispute that the proposed classes—which are defined clearly by the objective criteria of when and where people were insured—meets the implicit ascertainability requirement. But even if plaintiffs satisfied the remaining typicality and adequacy-of-representation requirements, they fail to satisfy the commonality requirement.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." A single common question of law or fact is sufficient to establish commonality, *Bell*, 800 F.3d at 374, and the Court need not resolve that question at this point, *id.* at 376. Rather, plaintiffs must merely demonstrate that a question susceptible to class-wide resolution exists. *Id.* at 375. As part of this analysis, the Court must determine if the proposed question is "capable of proof at trial *through evidence that is common to the class* rather than individual members." *Bell*, 800 F.3d at 375 (emphasis added); *see also id.* ("Cases in which low-level managers use their given discretion to make individual decisions without guidance from an overarching company policy do not satisfy commonality because the evidence varies from plaintiff to plaintiff."). The key is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up).

Plaintiffs propose the following question: "Does 'premium class' refer to a product-wide [] premium class, thereby requiring any premium increase to be imposed on [a] uniform, nationwide basis? Or, alternatively, does this language

5

authorize [Continental] to seek to maximize its rate increases on a state-by-state basis?" [163] at 18.[4] Plaintiffs argue that "the answer to this question 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* at 18 (quoting *Bell*, 800 F.3d at 378).

The meaning of the term "premium class" is a matter of contract interpretation, which "is ordinarily a matter of state law." *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015). The parties agree that the insurance policy "does not contain an express choice-of-law provision." [163] at 27; [160] at 57 ("Here, neither the master policies nor certificates contain choice of law provisions."). So under what state's law should the contract language here be interpreted?

To determine whether the meaning of the policy language can be resolved on a class-wide basis, the Court must first determine the appropriate choice-of-law rules and then apply those rules to determine what law controls contract interpretation here. Indeed, in an earlier appellate decision involving one of the consolidated cases, the Seventh Circuit noted: "Choice of law may well be decisive here." *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020).

"A federal court exercising its diversity jurisdiction over state-law claims applies the choice-of-law rules of the state in which it sits." *Id.* "In general, Illinois follows the Restatement (Second) of Conflict of Laws (Am. Law Inst. 1971)."

---

[4] Plaintiffs offer up a number of additional "common questions," *see* [163] at 18–19, but those questions are all "downstream" of the threshold question. *See* [210] at 11–12. When the Court pressed this point during oral argument on the class-certification motion, plaintiffs did not argue otherwise. *Id.* at 11–17.

*Id.* (citing *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill.2d 45 (2007)). This means that "[a]bsent effective party choice"—as is the case here—Illinois "chooses the 'local' law … of the state which, 'with respect to that issue, has the most significant relationship to the transaction and the parties'" to govern contract issues. *Id.* at 808–09 (quoting Restatement § 188(1)). In evaluating the most significant relationship, courts look at where the contract was negotiated, formed, and performed; where the subject matter of the contract is located; and "the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement § 188(2). These factors "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Group insurance contracts "are in essence three-party contracts" in which "[t]he central entity, not the individual insured, holds the master policy and has the chief contractual relationship with the insurer" and the "individual insureds are considered third-party beneficiaries of the master policy." *Gunn*, 968 F.3d at 804 (internal quotation marks omitted). The "central entity" here is the employer through which the plaintiffs receive their long-term care insurance. Each employer has its own contract with Continental—even if those separate contracts contain substantially identical language—and each contract thus would undergo its own most significant relationship analysis.

Plaintiffs argue that for all these contracts the "clear choice is Illinois," because Illinois is where Continental is headquartered, where the relevant policies were developed, where the rate increases at issue were "formulated and launched," and

where Continental "negotiated its contracts containing the term 'premium class.'" [163] at 27–28. Additionally, "[t]wo of the nine plaintiffs in this action reside in Illinois" and all parties would expect "that Illinois law will provide a uniform answer as to the meaning." *Id.* at 28.

The Court accepts—and Continental does not deny—that Continental is headquartered in Illinois and that its policies were developed in Illinois. But the choice of law is less clear than plaintiffs make out. For one thing, plaintiffs elsewhere assert that "there is no evidence of pre-contract negotiations," *id.* at 39, so place of negotiation would be of minimal importance. The choice of Illinois was also less clear to the Seventh Circuit, which suggested that "[a]pplied to this case, comment h to section 192 [discussing group life insurance contracts] of the Second Restatement seems to suggest that Illinois would choose *District of Columbia law* to govern Gunn's claim for breach of contract." *Gunn*, 968 F.3d at 809 (emphasis added). This is because "where an employer arranges for group life insurance for its employees … in the absence of an effective choice-of-law clause" courts will apply "the law governing the master policy" which "will usually be the state where the employer has his principal place of business." Restatement (Second) of Conflict of Laws § 192 cmt. h. Plaintiffs do not dispute this legal principle. [163] at 35–36.

The Court thus concludes that the location of a putative class member's employer provides the governing law for that class member. While neither party provides a comprehensive list or accounting of where the various employers are located, the employers of the named plaintiffs are located in Illinois, Pennsylvania,

the District of Columbia, Minnesota, and New Jersey, [19] ¶¶ 16–22; [160] at 10; [163] at 14, and plaintiffs note that Continental sold "as many [] policies as it could to nationwide employers located in 47 states," [163] at 8. (Plaintiffs do not point to any evidence that any employer's master policy is located in a different state than the employer is located.) These circumstances raise the problematic specter of the Court applying dozens of different state laws to interpret the term "premium class." *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) ("No class action is proper unless all litigants are governed by the same legal rules. Otherwise, the class cannot satisfy the commonality and superiority requirements of [Rule 23].").

Plaintiffs respond to this concern by arguing that "[i]f [] the Court … determines that the contract is governed by the law of each state where the employer groups are based," their motion should still be granted because "[v]ariations in state contract law boil down to three state groupings." [163] at 4. Plaintiffs borrow their approach from *Advance Trust & Life Escrow Services, LTA v. Security Life of Denver Insurance Company*, which certified a nationwide class after accepting the plaintiff's "fifty-state survey of how the jurisdictions at issue (1) determine whether a contract term is ambiguous, and (2) if those terms are ambiguous, how a court may determine that term's meaning." 1:18-CV-01897-DDD-NYW, 2021 WL 62339, at *8 (D. Colo. Jan. 6, 2021); [163] at 37.

Plaintiffs describe the *Advance Trust* approach as a "a simple two-stage inquiry involving six groups of states."[5] [163] at 37. At "Stage 1,"

> there are three groups of states: those that only consider the plain language of the contract to determine ambiguity; those that consider objective extrinsic evidence from the time the contract was made in addition to the plain text; and those that consider objective extrinsic pre- and post-contract formation evidence in addition to the plain text.

*Advance Trust*, 2021 WL 62339, at *8 (cleaned up). Then, at "Stage 2,"

> [the states are grouped] into three categories: those states that automatically apply the rule that an ambiguous term is to be construed against the insurer (*contra proferentem*); those that apply *contra proferentem* equally with extrinsic evidence; and those that apply *contra proferentem* as a last resort.

*Id.*

This two-step, multi-category approach does not strike the Court as particularly simple. And this concern does not just implicate Rule 23's superiority requirement. *See* Fed. R. Civ. P. 23(b)(3)(D) (tasking courts with considering "the likely difficulties in managing a class action"). It bears on commonality as well. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 674, 677 (7th Cir. 2001) (recognizing that choice-of-law issues affect both manageability and commonality and "thus the propriety of class certification").

Even if the Court were to accept plaintiffs' groupings—the composition of which Continental disputes, *see* [160] at 54–55, and which the Court addresses further below—two of plaintiffs' proposed groups at Stage 2 require courts to consider

---

[5] Plaintiffs provide charts of the different groups. *See* [163-8] at 163–201. The Court uses the blue CM/ECF pagination for this exhibit.

extrinsic evidence. Those two groups weigh extrinsic evidence differently, and this divergence cannot be brushed aside. "[E]ven where different states' doctrines differ only in nuance, ... that 'nuance can be important.'" *See Gunn*, 968 F.3d at 805 (citing *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995), which reversed certification of a nationwide class whose claims were governed by many different states' laws).

Moreover, even if both groups treated extrinsic evidence the same way, that does not mean that all potential class members will rely on the *same* extrinsic evidence. For example, in resolving ambiguities (Stage 2), Alaskan courts seek to "enforce the reasonable expectations of the parties" and assess those expectations in part by "relevant extrinsic evidence, including *the subsequent conduct of the parties*." *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996) (emphasis added). Similarly, Louisiana law instructs that "[a] doubtful provision must be interpreted in light of the nature of the contract, equity, usages, *the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties*." La. Civ. Code art. 2053 (emphasis added). The evidence used to establish the subsequent conduct of the parties or "contracts of a like nature" would necessarily differ by employer and thus undercuts plaintiffs' efforts to establish commonality. *See Parmenter v. Prudential Ins. Co. of Am.*, No. CV 22-10079-RGS, 2024 WL 3903076, at *3 (D. Mass. Aug. 22, 2024) (declining to certify class on commonality grounds when the ambiguous clause at issue appeared "in seven

11

different contracts" and those contracts "contain[ed] different terms and were negotiated by different people at unknown points in time").

As the Supreme Court has recognized, "[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *See Wal-Mart*, 564 U.S. at 350 (alterations and emphasis in original). And, critically, the Supreme Court continued: "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.*; *see also Bell*, 800 F.3d at 375. Here, dissimilarities exist both with respect to the legal rules that would apply to the litigants, *see In re Bridgestone/Firestone, Inc.*, 288 F.3d at 1015, and with respect to the different facts that would drive those rules' applications. This does not necessarily mean that a common answer would not emerge at the end of the day; it does, however, mean that the path to such an answer would be substantially "impede[d]." *Wal-Mart*, 564 U.S. at 350.

These difficulties do not just apply to Stage 2 in the proposed two-tiered, six-group plan. Continental notes that "[w]hile [the previous district court] rulings address the ambiguity issue as to some named plaintiffs, they do not as to other plaintiffs residing in different states." [160] at 54. So even if "[f]our judges ... have now held that the term 'premium class' ... is facially ambiguous," [163] at 7, the Court would still need to do that Stage 1 analysis for employers under the remaining applicable state laws. And the approach used by at least one state in the mix calls for the examination of extrinsic evidence. For example, Washington courts have "adopted

the 'context rule' and recognized that intent of the contracting parties cannot be interpreted without examining the context surrounding an instrument's execution" and the allowable "extrinsic evidence may include … all the circumstances surrounding the making of the contract" and "the subsequent acts and conduct of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 502 (2005).

*Hearst* raises another issue. The *Advance Trust* approach assumes two stages: determining whether ambiguity exists and then resolving that ambiguity. But it is not clear to the Court that this distinction exists in practice—at least across all jurisdictions. *Hearst* does not discuss ambiguity, and the intermediate appellate court opinion that *Hearst* affirmed noted that Washington courts "may consider evidence extrinsic to the contract itself" to discern the contracting parties' intent, "*even when the contract terms are not themselves ambiguous.*" *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 120 Wash. App. 784, 791 (2004), *aff'd*, 154 Wash. 2d 493 (2005) (emphasis added.). Similarly, "Alaska courts may use extrinsic evidence regarding the intent of the parties to interpret a contract *regardless of whether the contract appears to be ambiguous on its face or not.*" *Anchorage*, 922 P.2d at 258–59 (cleaned up) (emphasis added).

Continental also raises other concerns with the validity of plaintiffs' proposed groupings. [160] at 55. These concerns are shared by the Court. For example, plaintiffs' grouping chart puts Georgia in the Stage 2 category of "No Extrinsic Evidence." [163-8] at 183. But Continental points to *Grange Mutual Casualty Company v. Snipes*, which states that "[e]xtrinsic evidence may be considered to

13

explain an ambiguity in an insurance contract." 298 Ga. App. 405, 408, 441 (2009); *see also id.* ("Accordingly, we consider the circumstances surrounding the renewal of the policy, including the Agreement, to glean the parties' intent."); [160] at 55.

In their reply, plaintiffs cite an earlier case, *Associated Services of Accountable Professionals, LTD., Inc. v. Workman*, in which the Court of Appeals of Georgia did not consider extrinsic evidence "because application of the rules of contract construction has resolved any ambiguity that might have been present." 265 Ga. App. 348, 351 (2004); [181] at 13. But, as *Workman* itself notes, this was not a bar on extrinsic evidence, but rather because the principle of *contra proferentem* had resolved the ambiguity without need to resort to extrinsic evidence. *See Workman*, 265 Ga. App. at 351 n.9 (citing *Empire Distributors v. George L. Smith II &c. Auth.*, 235 Ga. App. 742, 744 (1998)) (extrinsic evidence admissible to explain ambiguity that remains after application of pertinent rules of contract construction).

Georgia is thus clearly not a "jurisdiction[] that permit[s] no consideration of extrinsic evidence." [163] at 38. Rather, it is a jurisdiction where extrinsic evidence is permitted only if principles of contract construction like *contra proferentem* cannot resolve ambiguity. This means that not only have plaintiffs miscategorized Georgia in their grouping scheme, but also that there are at least four groups at Stage 2 rather than three: (1) no extrinsic evidence considered, (2) *contra proferentem* and extrinsic evidence together, (3) *contra proferentem* as a last resort, and now (4) extrinsic evidence as a last resort.

Continental points out a similar problem with the Stage 2 categorization of Missouri, which plaintiffs also put in the "No Extrinsic Evidence" group. [163-8] at 185. But in Missouri "even if [a contract term] is not ambiguous on its face, that does not compel the conclusion that an ambiguity is not involved which would authorize the consideration of extrinsic evidence." *Finova Cap. Corp. v. Ream*, 230 S.W.3d 35, 48 (Mo. Ct. App. 2007). Indeed, in Missouri "[a] latent ambiguity, not being apparent on the face of the writing, *must be developed by extrinsic evidence* to show the real intent of the parties." *Id.* (emphasis added). Thus, instead of Missouri being a jurisdiction that allows "no consideration of extrinsic evidence" at Stage 2, as plaintiffs assert, *see* [163] at 39, it is a jurisdiction that in at least some cases compels the use of extrinsic evidence.

The Court's research revealed at least one additional issue with the plaintiffs' categorization efforts. For example, at Stage 2 Utah is categorized as a jurisdiction that uses "objective extrinsic evidence & *contra proferentem* together," [163-8] at 195, but Utah courts are clear that *contra proferentem* is "the last resort in contract interpretation" to be used only if "the extrinsic evidence is not conclusive." *Fire Ins. Exch. v. Oltmanns*, 2012 UT App 230, ¶ 7.

To be clear, the Court did not conduct its own 50-state survey. This was plaintiffs' assignment. Therefore, even the handful of errors the Court has discussed (and there may be more) significantly undermine the credibility of plaintiffs' "simple," two-step proposal. Because plaintiffs' proposed categorization scheme is legally flawed, because it requires applying different legal rules to the same class of litigants,

and because it fails to reckon with the individualized inquiries that contract interpretation on the scale a nationwide class would require, plaintiffs have not met their burden of demonstrating that the meaning of "premium class" is something that "*is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Bell*, 800 F.3d at 375 (7th Cir. 2015) (quoting *Messner*, 669 F.3d at 818) (emphasis in original).

Of course, "the mere need for extrinsic evidence does not in itself render a case an improper vehicle for class litigation," *Red Barn Motors, Inc. v. NextGear Cap., Inc.*, 915 F.3d 1098, 1102 (7th Cir. 2019), and Continental must "present [] specific evidence—as opposed to mere speculation" that the need for extrinsic evidence would defeat commonality, *see Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 298 (N.D. Ill. 2014). As a predicate matter, it is worth noting that the circumstances in *Red Barn* were very different from the ones here. Choice of law was not an issue in *Red Barn*, and there was no prospect there that different legal rules would apply to different litigants. Instead, "the class was already narrowed to those who signed the specific form contract at issue" and "[w]ith such a form contract, almost universally signed without negotiation or modification, there [was] no reason to think that the interpretation of the provision [would] vary from one signatory to another." *Red Barn*, 915 F.3d at 1102. At the same time, the Court recognizes that *Red Barn* asked district courts to "identify" what extrinsic evidence "would render class certification improper" and "why." *Id.*

Here, Continental points to several pieces of extrinsic evidence that, in the Court's estimation, would impede efforts to find a common answer to the common question: what does "premium class" mean? For example, some states expressly deem applicable statutory provisions to be part of insurance contracts, which could give legally different meaning to facially identical contract language. *See* [160] at 51; [160-5] at 50–52.[6] Similarly, disclosures in marketing materials could bear on the understanding of the insurance contracts and vary from employer to employer, *see, e.g.*, *Hanson v. Lincoln Nat'l Life Ins. Co.*, No. CV 19-551-MWF (JEMX), 2021 WL 4555305, at *5 (C.D. Cal. Aug. 3, 2021) (allowing defendant-insurer's marketing materials to be submitted as extrinsic evidence where disability insurance policy was ambiguous about calculation of post-disability income), and "[t]here were informational presentations to prospective purchasers where rate increases may have been discussed." [160] at 51–52. In addition, Continental asserted at oral argument that "[t]he way this works is that [Continental] negotiated with the employer group," [210] at 54:9–10, and this representation is supported by record evidence. For example, Continental points to a March 1999 questionnaire in which it responded to a lengthy series of questions and statements from the Administrative Office of the Federal Judiciary about the long-term care program. [158-8] at 65–157.[7] One statement presented to the Continental by the Administrative Office was as follows: "Initial rates will be guaranteed through August 31, 2004. Rates will be adjusted

---

[6] The Court uses the blue CM/ECF pagination for this exhibit.

[7] The Court uses the blue CM/ECF pagination for this exhibit.

17

infrequently thereafter." *Id.* at 139. Continental responded: "CNA agrees." *Id.* All of this evidence amounts to more than "mere speculation" that extrinsic evidence individual to each employer may be required to determine the meaning of "premium class."

Plaintiffs attempt to rebut these arguments by pointing to testimony from Continental witnesses describing the term "premium class" as "boilerplate" contractual language, conceding that the company was unaware of any discussions with group plan sponsors about the meaning of the term premium class, and agreeing that uniform, nationwide rates were "important to group customers." *See* [210] at 20; [163-4] at 54[8] (in document titled "GAO Questions on Oversight of Long-Term Care Insurance," Continental states "although we are usually able to end up with a single set of rate nationwide (which is highly important to group customers), the administrative overhead of substituting benefits and complying with other [extraterritoriality] regulations is substantial and costly"); *id.* at 269–70 (Munro Deposition: "Q: Was the term 'premium class' in the policies and certificates a negotiated term? A: Not to my knowledge, no. Q: It was a boilerplate part of the contract, right? … A: That would be my interpretation. Q: Are you aware of [Continental] discussing the meaning of the term … with any group plan sponsors? A: I cannot say."). Plaintiffs' evidence, however, does not *per se* eliminate the relevance of other extrinsic evidence—the kind to which Continental points—in jurisdictions where extrinsic evidence is part of the contract-interpretation calculus.

---

[8] The Court uses the blue CM/ECF pagination for this exhibit.

* * *

In summation: The laws of as many as 47 states might be required to interpret the term "premium class" in class members' insurance policies. While plaintiffs have proposed six groups of state-law approaches in an effort to account for this challenge, their proposed groupings do not reflect the actual state of the law. In addition, some—but not all—of the states' approaches allow or require extrinsic evidence, and based on the record now before the Court, there is good reason to believe that the evidence presented could vary from employer to employer within the proposed class. This is simply not a situation where the meaning of "premium class" is a question amenable to class-wide resolution by class-wide evidence. Thus, plaintiffs have not shown that the meaning of "premium class" could be commonly answered even within their proposed subclasses. "The manifest disjointedness destroys commonality." *Hansen v. Country Mut. Ins. Co.*, 18 C 244, 2023 WL 6291629, at *25 (N.D. Ill. Sept. 25, 2023).

None of this is to say that a more limited class—one confined to a particular state or employer, or to jurisdictions that disallow extrinsic evidence in both identifying and resolving contractual ambiguities—would be unable to satisfy the commonality requirement. *See Szabo*, 249 F.3d at 678 ("If any class treatment is appropriate, a class limited to a single state (or customers of a single dealer) would be more practical."); [210] at 19:14–20:7. And while *Szabo* acknowledged that winnowing down a nationwide class in this manner might leave "too few to justify class treatment," *Szabo*, 249 F.3d at 678, that outcome seems unlikely here given plaintiffs' estimate of "hundreds of thousands of individual claims." [181] at 5. The

Court offers these thoughts to guide plaintiffs if they choose to renew their motion for class certification with a narrower class definition.

### B.    Rule 23(b)

The Court's analysis could end here, although it will go on to note additional obstacles plaintiffs face in their class-certification effort.

Even if plaintiffs could meet all of Rule 23(a)'s requirements, they must also satisfy one of the requirements under Rule 23(b). Plaintiffs contend that their proposed declaratory relief class is appropriate under Rule 23(b)(1)(A) or, in the alternative, Rule 23(b)(2). [163] at 21. Plaintiffs next argue that the proposed injunctive and reinstatement classes is appropriate under Rule 23(b)(2). *Id.* at 24–25. Finally, plaintiffs contend that their proposed damages classes satisfy the requirements of Rule 23(b)(3). *Id.* at 25. The Court goes through each statutory provision in turn.

### 1.    Rule 23(b)(1)(A)

Rule 23(b)(1)(A) is satisfied if "prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Put another way, these are "cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (cleaned up).

Plaintiffs argue that the Rule 23(b)(1)(A) requirements "are met because Plaintiffs contend that the contract requires [Continental] to treat 'all class members alike.'" [163] at 21–22 (quoting *Amchem*, 521 U.S. 591 at 614). But whether the contract requires Continental to treat all class members alike is a merits issue that the Court cannot resolve on a motion for class certification. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). And even were the Court able to consider the merits of whether the contract requires Continental "to treat all class members alike," that is not a question that can be resolved on a class-wide basis. *See supra.*

Plaintiffs have therefore not satisfied the requirements of Rule 23(b)(1)(A).

## 2. Rule 23(b)(2)

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The Supreme Court has instructed that "Rule 23(b)(2) applies only when *a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.*" *Wal-Mart*, 564 U.S. at 360 (emphasis added).

But, as explained above, it is not evident that this Court could issue a single injunction or declaratory judgment that could provide relief to each member of the nationwide class. Because the interpretation of "premium class" might differ among

21

states, the Court's declaration that the term meant a single, nationwide class under, say, Illinois law would not necessarily give relief to class members in other states, nor would an injunction based on that conclusion of law.

The Court thus concludes that, under *Wal-Mart*, plaintiffs have not demonstrated that they are entitled to an injunction or declaratory judgment under Rule 23(b)(2).

### 3.    Rule 23(b)(3)

Finally, Rule 23(b)(3) certification is appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." But for a common question to predominate, there must be a common question. And, as discussed above, plaintiffs have not identified a common question that is amenable to class-wide resolution. Because "[p]laintiffs fail to meet the commonality requirement, they also fail to meet the predominance requirement." *Kolish v. Metal Techs., Inc.*, No. 216CV00145JMSMJD, 2017 WL 525965, at *14 (S.D. Ind. Feb. 8, 2017).

Plaintiffs have therefore not satisfied the requirements of Rule 23(b)(3).

## III.    Amicus Brief and *Daubert* Motions

Two related motions remain. First, the Court has before it an opposed motion for leave to file an amicus brief by the American Council of Life Insurers and the American Property Casualty Insurance Association ("the amici"), both industry groups. [169]. No rule governs amicus appearances in the district courts, but Federal

Rule of Appellate Procedure 29 provides that a motion for leave to file an amicus brief should state (1) "the movant's interest," and (2) "the reasons why the amicus brief is beneficial and aids in the disposition of the case." Fed. R. App. P. 29(a)(3). The Seventh Circuit does not "grant rote permission to file an amicus curiae brief" but, as relevant here, only "when the amicus has a unique perspective, or information, that can assist the court of appeals beyond what the parties are able to do." *Nat'l Org. for Women, Inc. v. Scheidler*, 223 F.3d 615, 617 (7th Cir. 2000). The Court follows the approach laid out by the Seventh Circuit.

The amici assert as their interest that "a number of the arguments advanced by Plaintiffs in these cases are fundamentally inconsistent with the state-based system pursuant to which [long-term care insurance] group policies and other insurance products are regulated." [169-1] at 1. In particular, the amici contend that "Plaintiffs' proposed classes and damages methodology based on disparities between rates charged in different jurisdictions as a result of the exercise of valid state authority are fundamentally inconsistent with the state-based system of rate regulation." *Id.* at 3. But this argument echoes Continental's extensive briefing about the state-based insurance regulatory framework, *see, e.g.*, [160] at 7–14, and thus does not strike the Court as a unique perspective. Besides, as discussed above, the Court does not reach the issue of a damages class, because it concludes that plaintiffs have not demonstrated commonality under Rule 23(a)(2). And because the Court does

not reach this issue, the amici's perspective as insurance industry experts is not needed to resolve the purely legal issue of commonality.

The amici's motion is thus denied as moot, without prejudice to renewal should the Court need to consider the issue of a damages class in the future or if another issue presents itself in which the amici are uniquely situated to provide information or insight that the parties cannot. *See Scheidler*, 223 F.3d at 617 (the court of appeals may grant permission to file an amicus brief "when the amicus has a unique perspective, or information, that can assist the court of appeals beyond what the parties are able to do").

The Court denies Continental's motion to exclude the testimony of Roger Loomis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), [161], as moot for similar reasons. Continental objects to Loomis's proposed testimony on the following issues: "(1) the meaning of 'premium class' in plaintiffs' insurance contracts, (2) the feasibility of a nationwide rate increase, and (3) the propriety of [Continental's] rate increase requests." [156] at 1. But, again, because the motion for class certification fails on commonality, the Court does not reach those issues and thus does not consider Loomis's expert testimony to resolve the motion. The Court denies the Continental's *Daubert* motion as moot on that basis. *See Serrano v. Menard, Inc.*, 671 F. Supp. 3d 877, 883 (N.D. Ill. 2023) ("Thus, because the Court does

not find it essential to rule on defendant's *Daubert* motion before resolving the summary judgment motion, we deny defendant's *Daubert* motion as moot.").

Continental may renew the motion if Loomis's testimony is at issue in the future.

## IV. Conclusion

For the reasons given above, plaintiffs motion for class certification [132], [163] is denied. Continental's motion to exclude the testimony of Roger Loomis [156], [161] is denied without prejudice as moot. The motion of the amicus parties for leave to file an amicus brief [169] is also denied as moot.[9]


ENTER:

_____

Georgia N. Alexakis
United States District Judge

Date: 2/6/2026

---

[9] The Court's ruling also disposes of the identical *Daubert* motions and identical motions by the amici for leave to file an amicus brief in the related cases. Those docket entries are as follows: in *Gunn*, No. 18 CV 3314 (N.D. Ill.), docket entries [240], [244], and [247]; in *Sieving*, No. 20 CV 5127 (N.D. Ill.), docket entries [220], [223], and [227]; in *Brown*, No. 21 CV 2349 (N.D. Ill.), docket entries [152], [156], and [159]; and in *Cheslow*, No. 21 CV 4010 (N.D. Ill.), docket entries [149], [153], and [156].